ORIGINAL



**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DAVID MACKENZIE,

       Plaintiff,

    v.

     **CASE NO. 8:00-CV-2405-T-23B**

     **COLLECTIVE ACTION**

KINDRED HOSPITALS EAST, L.L.C.
f/k/a VENCOR HOSPITALS EAST, L.L.C.,

       Defendant.

_____/

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION TO STRIKE DEFENDANT'S OFFER OF JUDGMENT**

Defendant, Kindred Hospitals East, L.L.C. , through undersigned counsel, respectfully submits

its response to Plaintiff's Motion to Strike Defendant's Offer of Judgment. For reasons discussed in more

detail below, Plaintiff's Motion should be denied.  First, Plaintiff's Motion fails for the fundamental

reason that it seeks to strike a document that has never been filed with this Court.  Furthermore, none of

the case law cited by Plaintiff provides any support whatsoever to his contention that Defendant's offer

of judgment in this case is somehow improper.  The arguments contained in Plaintiff's

motion/memorandum and the case law and rules cited in support thereof indicate a fundamental

misunderstanding of the differences between § 216(b) of the Fair Labor Standards Act ("FLSA") and

Federal Rule of Civil Procedure 23, which governs class actions.  Despite Plaintiff's arguments to the

contrary, no putative class member or anyone else waives any right or has any right extinguished by

Plaintiff's acceptance of a Rule 68 offer of judgment.

**I. INTRODUCTION AND BACKGROUND**

Plaintiff brings this action under § 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b),

alleging that he and potentially other similarly-situated pharmacists employed by Defendant are entitled to overtime compensation and damages under the Act. On January 11, 2002, this Court granted Defendant's Motion Dismiss all prepetition claims, which consist of all alleged violations of the FLSA committed before September 13, 1999. Because Plaintiff was terminated from his position in June, 2000, the period of time in which he can recover any damages for any allegedly unpaid overtime is limited to September 13, 1999 through June, 2000.[1]

As part of the discovery process, Defendant has produced both payroll and timecard records for Plaintiff. These records indicate that, at most, Plaintiff worked a total of 32.5 hours in excess of 40 in a work week during the entire period from September 13, 1999 through June, 2000. Plaintiff agreed in his deposition that these records are accurate. (Plaintiff's Depo., pp. 139-140; attached as Ex. 1). Plaintiff also testified that he was paid at his regular rate for all hours in excess of 40 in a work week during the given period. (Plaintiff's Depo., pp. 104-105). If Plaintiff were entitled to overtime, which Defendant denies, he would only be entitled to half time for those 32.5 hours, which at his rate of pay is $552.33.

Given this negligible amount of potential overtime liability and the mounting expense of the litigation, Defendant chose to offer Plaintiff full relief. (*See*, Defendant's June 28, 2002 letter, attached as Ex. 2). Defendant thus served Plaintiff with a Rule 68 offer of judgment in the amount of $1200.00, plus his costs accrued to date, and attorneys' fees subject to a mutual agreement or court-ordered award. Defendant arrived at that figure by taking the base potential overtime liability described above, doubling it to account for potential liquidated damages under the FLSA, and then

---

[1]The period of time covering Plaintiff's potential damages is further limited by the fact that Plaintiff applied for and received extended leave under the Family Medical Leave Act in late 1999.

rounding up to insure that Plaintiff was offered full and complete relief.

Plaintiff responded to the Rule 68 offer by saying it would be "inappropriate to allow any compelled settlement under Rule 68 to extinguish the right to the putative class members in this cause of action." (Plaintiff's Ex. 2). Plaintiff did not explain how any "putative class members" would be effected by an acceptance of the Rule 68 offer. Defendant responded to Plaintiff's July 1 letter and explained that "unlike a Rule 23 action in which the class has been certified, any potential FLSA claimants must pursue their own claims even if they do so within the framework of a collective action. The right to bring their own claims is not extinguished, but rather only the vehicle by which they may pursue their claims will be affected." (See, Defendant's July 2, 2002 letter, attached as Ex. 3). Defendant submits this was an appropriate offer of judgment under Rule 68 and that its explanation in its July 2 letter is legally accurate. This seems particularly true given the fact that Plaintiff has admitted that no other "putative class members" have expressed any interest in joining this lawsuit despite the fact that Plaintiff has contacted at least two of those potential persons.[2] (Plaintiff's Depo., pp. 154-159). Plaintiff then responded with the instant motion to strike even though the Rule 68 offer has never been filed with this Court.

---

[2]Plaintiff relies on an affidavit from his counsel as support for the proposition that there are other pharmacists who have worked more than 40 hours in a workweek during the relevant period and who were not paid "one and one-half times their regular rate of compensation for the hours worked." (Plaintiff's Ex. 1, ¶ 3). This reliance fails, however, because the affidavit is entirely composed of hearsay. Paragraph 2 of the affidavit is simply a paraphrase of federal regulations and a case from the District of Columbia. Paragraph 3 is entirely hearsay, as it is counsel's narrative of the evidence in this case. Put simply, Plaintiff has relied on the out-of-court statement of his counsel and submitted that statement to prove the truth of the matter asserted: that other pharmacists are entitled to unpaid overtime. The affidavit is therefore inadmissible hearsay under Federal Rules of Evidence 801 and 802.

## II. ARGUMENT AND CITATION OF AUTHORITY

**A.     The Court Cannot Strike a Document Which Has Never Been Filed With It.**

Plaintiff's motion to strike Defendant's offer of judgment should be denied for several reasons. The first and simplest of these reasons is that the motion seeks the legally impossible by asking this Court to strike a document that has never been filed with it. Although attempts to strike unfiled documents are undoubtedly rare, courts have actually addressed the issue on occasion and reached this obvious conclusion. *See*, e.g., <u>Asch v. Teller, Levit & Silvertrust, P.C.</u>, 200 F.R.D. 399, 401 (N.D. Ill. 2000)("Since defendant's offer of judgment was never filed, there is nothing to strike and plaintiff's motion to strike is accordingly denied as moot.").

**B.     Plaintiff's Arguments to Strike Based on F.R.C.P. 23 are Misplaced.**

   1.    *Section 216(b)'s "opt-in" system is fundamentally different from Rule 23's "opt-out" approach.*

Plaintiff's motion should also fail because the arguments, rules, and laws cited in its support are completely inapplicable to § 216(b) actions under the FLSA. *See*, <u>Alix v. Shoney's Inc.</u>, 3 WH Cases2d 1532 (E.D.La. 1997)(stating that "the provisions of Rule 23 are inapplicable to any action brought under the FLSA in light of 28 U.S.C. § 216(b) . . ." and citing cases from numerous circuits for the proposition). As discussed above, these arguments and legal support as well as correspondence from Plaintiff's counsel seem to evidence a fundamental misunderstanding of the differences between § 216(b) and Federal Rule of Civil Procedure 23.

Perhaps the most basic of those differences, and undoubtedly the biggest difference at issue here, is that Rule 23 class actions provide for an "opt-out" scheme, where any plaintiffs deemed to belong in the class are legally bound by the outcome of the action unless they affirmatively opt out

of that action. In direct contrast, § 216(b) is an "opt-in" scheme in which potentially "similarly situated" plaintiffs must affirmatively choose to join the lawsuit in order to be bound by its outcome. Those potential plaintiffs who are similarly situated to a named plaintiff in a § 216(b) action and who choose not to opt in to that action do nothing to affect their rights in any way. As one court put it,

> This "opt-in" requirement distinguishes § 216(b) collective actions from class actions brought under Rule 23 of the Federal Rules of Civil Procedure. Rule 23 provides that, in the case of a class certified pursuant to subsection (b)(1) or (b)(2), all class members are bound by the court's decision irrespective of their desires and that, in the case of a class certified pursuant to subsection (b)(3), they are bound by the court's decision unless a class member notifies the court prior to resolution of the case that she desires to opt out of the class. Under 216(b), in contrast, a person is not considered a member of the "collective action" and will not be bound by or benefit from the court's judgment unless the person has filed a written consent with the court and thereby affirmatively "opted in" to the suit.

Garner v. G.D. Searle Pharmaceuticals & Co., 802 F.Supp. 418, 421 (M.D. Ala. 1991)(citing LaChapelle v. Owens-Illinois, Inc., 513 F.2d 286, 288 (5th Cir. 1975)).[3]

Nevertheless, Plaintiff asserts that a settlement would "extinguish" the rights of the putative plaintiffs and that "all putative plaintiffs are unaware of this action and their rights under the FLSA." (Plaintiff's Memo, p. 5). The latter contention is made despite the fact that Plaintiff has admitted at deposition that he has contacted at least two "putative plaintiffs" who were not interested in pursuing this lawsuit. (Plaintiff's Depo., pp. 154-159). Plaintiff's stated concern for these putative plaintiffs is thus unfounded, given that their rights would not be extinguished whatsoever by any settlement of the instant case and that the instant case may very well never meet the requirements necessary of a

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

§ 216(b) collective action. *See*, <u>Dybach v. State of Florida Dept. of Corrections</u>, 942 F.2d 1562, 1567 (11th Cir. 1991)(district court has power to give notice to potential class members in § 216(b) case only if it can "satisfy itself that there are other employees . . . who desire to 'opt-in' and who are 'similarly situated'" to plaintiff); <u>Santielices v. Cable Wiring, Inc.</u>, 1999 WL 1007807 (S.D. Fla. 1999)(attached as Ex. 3)(citing <u>Dybach</u> and denying motion for notice because plaintiff had failed to provide evidence that others desired to opt in).

Put simply, if Plaintiff Mackenzie had accepted the Rule 68 offer of judgment and the Court had chosen to dismiss the instant case, any and all current or former pharmacist employees of Defendant would still be perfectly free to bring their own individual action or their own collective action under the FLSA. Plaintiff's argument that the "rights of the putative class members" are somehow adversely affected by the Rule 68 offer is legally incorrect and provides no support for his motion to strike that offer.

2.      *Plaintiff attempts to support his argument to strike the Rule 68 offer by relying on Rule 23 cases that have nothing to do with Rule 68 or proposed settlements.*

Similarly, each and every one of the cases cited as support by Plaintiff is misplaced because each is based on the same fundamental failure to recognize the differences between Rule 23 and § 216(b). In fact, only one of the nine cases in Plaintiff's memorandum has any connection to the FLSA or § 216(b); each and every one of the remaining cases involves class actions under Rule 23.

In addition, the majority of the Rule 23 cases cited by Plaintiff do not even involve a Rule 68 offer of judgment. For example, Plaintiff cites the <u>Glidden</u>, <u>Wallican</u>, <u>Diaz</u>, and <u>Rice</u> decisions to support his statement that "the impropriety of Rule 68 in class or collective actions can be gleaned from class cases under Rule 23." (Plaintiff's memo, pp. 5). These cases offer no such support, as

none of the four deals with a Rule 68 offer of judgment or any kind of settlement whatsoever.[4]

Plaintiff then attempts to argue that the Eleventh Circuit "has not taken an official position as regards this issue," but that it would most likely follow the "majority approach" in a Rule 23 case and that the Rice decision somehow suggests that. (Plaintiff's memo, pp. 5-6). This is a curious conclusion given that the district court held that Rule 23(e) does not apply to putative class actions prior to certification of a class and that the Eleventh Circuit affirmed the decision without deciding the issue. See, Rice v. Ford Motor Co., 88 F.3d 914 (11th Cir. 1996). As the court explicitly said, "[i]n this Circuit, the applicability of Rule 23(e) to proposed classes prior to their certification is an open question." Id. at 920, n.8.

3.   *The lone FLSA case cited as support also has nothing to do with Rule 68.*

The one FLSA decision cited by Plaintiff is inapposite to the issues in this case. Although Plaintiff attempts to rely on Lynn's Food Stores Inc. v. United States, 679 F.2d 1350 (11th Cir. 1982), as an articulation of the Eleventh Circuit's statement of "appropriate protocols for settlement of Section 216(b) cases," that case is readily distinguishable from the situation at bar. In Lynn's Foods, an employer attempted to settle FLSA claims with its unrepresented employees in the absence of a lawsuit or Department of Labor approval. The case actually stands for the well-worn proposition that employers cannot "contract out of" their obligations under the FLSA and further provides that district courts must approve settlement offers in FLSA lawsuits. It is inapplicable to the instant case because it specifically distinguishes adversarial proceedings from the situation at issue there. Id. at 1353-54

---

[4]Plaintiff also acknowledges in this section that the law of the Fourth Circuit runs contrary to his arguments based on Rule 23. See, Plaintiff's memo, p. 5 (citing Shelton v. Pargo, 582 F.2d 1298, 1303 (4th Cir. 1978)). Of course, like the Glidden, Wallican, Diaz, and Rice decisions cited as "support" by Plaintiff, this case does not involve a Rule 68 offer or a § 216(b) action.

("Settlements may be permissible in the context of a suit brought by employees under the FLSA for back wages because initiation of the action by the employees provides some assurance of an adversarial context."). Furthermore, Lynn's Foods does not remotely address the propriety of a Rule 68 offer in a §216(b) context. The lone FLSA case cited by Plaintiff in support of his motion to strike is thus irrelevant to the issues at bar.[5]

4.    *The remaining cases cited by plaintiff address Article III case and controversy requirements or post-judgment issues and do not relate to issues currently before this Court.*

Finally, Plaintiff cites three more cases in an attempt to support the statement that "it is important to note that indeed Plaintiff represents not only his own individual or representative claim, but the claims of a proposed putative class." (Plaintiff's memo, p. 6). Again, none of the cases cited are § 216(b) actions and none support a motion to strike a Rule 68 offer of judgment. In fact, in Deposit Guaranty Nat'l Bank of Jackson, Mississippi v. Roper, the Supreme Court only held that a district court's entry of judgment in favor of the named plaintiffs over their objection did not moot their private case or controversy and therefore gave them standing to appeal the decision denying their motion for class certification. 445 U.S. 326, 340 (1980). The sole issue was whether a named plaintiff's right to pursue an appeal of a decision denying class certification was mooted by an entry of judgment in favor of the plaintiff. Id. The Court made no rulings relevant to the propriety of a

---

[5]To the extent that Plaintiff cites Lynn's Foods for some blanket proposition that a Rule 68 offer is inappropriate because the Court must approve any settlement in an FLSA case, his argument is also unavailing. Rule 23 class actions require similar court approval, and the use of Rule 68 offers of judgment in no way conflicts with that requirement. *See*, Gordon v. Gouline, 81 F.3d 235, 239 (D.C. Cir. 1996)("[I]n the context of class actions, Rule 68 offers of judgment are routinely employed despite the fact that all agreements must subsequently be approved by the court after a fairness hearing."); *see also*, Section C, *infra*, discussing why Defendant's Rule 68 offer would be appropriate even if Rule 23 applied to this case.

Rule 68 offer in any kind of case, much less in a § 216(b) action.

Plaintiff cites Gay v. Waiters' and Dairy Lunchmen's Union Local 30, 86 F.R.D. 50 (N.D. Cal. 1980) and Martin v. Mabus, 734 F.Supp. 1216 (S.D. Miss. 1990) while arguing that "the failure of the present proposed settlement to meet the requirements of being fair and non-coercive as well as noninjurious to the rights of putative class members" provides a basis for striking Defendant's Rule 68 offer. (Plaintiff's memo, p. 7). Once again, Plaintiff does not explain how the rights of putative class members are effected in any way by Defendant's Rule 68 offer or how they would be effected if Plaintiff had accepted the offer. Once again, the cases cited in support do not involve § 216(b) actions or an attempt to strike a Rule 68 offer.

In Gay, the court only addressed the issue of "whether an award of costs according to Rule 68 is mandatory when the party who refused an offer of judgment was a class representative." 86 F.R.D. at 501. The Gay court did not rule on the propriety of the Rule 68 offer in the first place, but apparently did not strike that offer since it was still an issue post-trial. Id. That court merely held that the imposition of costs under Rule 68 was not *mandatory* where the party who refused an offer of judgment was a class representative. Id. at 504. Similarly, Martin is a post-judgment voting rights case in which the defendants sought to obtain costs after trial under Rule 68, but were denied because the court determined, *inter alia*, that they had never made an offer pursuant to Rule 68. 734 F.Supp. at 1221-22. The Martin court was not presented with the issue of the propriety of a Rule 68 offer to a named plaintiff where no class has been certified under Rule 23, much less under § 216(b). As discussed in the section below, courts who have been presented with this issue in Rule 23 cases have determined not only that a Rule 68 offer is appropriate, they have held that the offer effectively moots the named plaintiff's claims.

**C.** **Defendant's Rule 68 Offer Would be Appropriate Even If This Were a Rule 23 Class Action.**

As discussed above, Plaintiff relies entirely on case law and arguments dealing with Rule 23 in his attempt to argue that Defendant's Rule 68 offer is somehow improper. This argument is not only misplaced given that this case is not governed by Rule 23, it is not even the law under that Rule. Courts have stated that Rule 68 offer of judgments to a single plaintiff are appropriate and must be given effect in a Rule 23 class action, at least if the case has not yet been certified when the offer is made. *See, e.g.*, Ambalu v. Rosenblatt, 194 F.R.D. 451 (E.D.N.Y. 2000)(holding that a Rule 68 offer providing the only named plaintiff with full relief effectively mooted the plaintiff's claim given that a class had not been certified); Greisz v. Household Bank, 176 F.3d 1012, 1015 (7th Cir. 1999)(stating that a Rule 68 offer that comes before class certification is sought, and thus before the existence of other potential plaintiffs, is proper and citing Holstein v. City of Chicago, 29 F.3d 1145, 1147 (7th Cir. 1994)); Wiskur v. Short Term Loans, 94 F.Supp.2d 937 (N.D. Ill. 2000)(because defendant's offer of judgment on plaintiff's original TILA claim came before a motion for class certification was sought, and was for an amount greater than plaintiff could have received had she gone to judgment, the TILA claim was moot once the offer was made) . The logic in the **Ambalu,** Greisz, Holstein, and Wiskur case applies just as well to the facts of this case. A pre-certification settlement of a Rule 23 case binds only the named plaintiff, just as settlement of a § 216(b) collective action binds only those named plaintiffs or others who have chosen to opt in. Plaintiff's arguments based on Rule 23 principles are therefore not only misplaced in the instant case, they fail to support his argument even if the case were brought under that Rule.

## III. CONCLUSION

Plaintiff has responded to an offer of judgment with a motion that asks the court to strike a document that has never been filed with it and has based that motion on inapposite law and insufficient reasoning. Based on the foregoing reasons, Plaintiffs' motion should be denied.

This 31st day of July, 2002.

Christine E. Howard
Ga. Bar No. 370097
Fla. Bar No. 872229
Jeffery E. Robertson
Ga. Bar No.609739

FISHER & PHILLIPS LLP
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, Georgia 30326
(404) 231-1400
(404) 240-4249 (FAX)

and

Carlos Burruezo
Florida Bar No. 843458

FISHER & PHILLIPS LLP
1250 Lincoln Plaza
300 South Orange Avenue
Orlando, Florida 32801
(407) 541-0888

ATTORNEYS FOR DEFENDANT

-11-

# EXHIBIT

# 1

1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DAVID MACKENZIE,

          Plaintiff,

vs.                              CASE NO. 8:00-CV-2405-T-23B

VENCOR HOSPITALS EAST, L.L.C.,

          Defendant.
_____/   ORIGINAL


        PLACE:        The Linesch Firm
                      700 Bee Pond Road
                      Palm Harbor, Florida   34683

        DATE:         June 6, 2002

        TIME:         9:00 a.m. - 3:25 p.m.

        REPORTED BY:  Susan M. Valsecchi, RPR
                      Registered Professional Court Reporter
                      Sixth Judicial Circuit



        -------------------------------------------
                DEPOSITION OF DAVID MACKENZIE
        -------------------------------------------
                            Pages 1 - 178



                    VALSECCHI REPORTING
              111 N. Belcher Road, Suite 206
                 Clearwater, Florida  33765
                      (727) 771-1995

1    Q.    And it was a biweekly pay period?

2    A.    You would receive a check every two weeks.

3    Q.    Do you recall it being discussed that it was -- as

4  far as expectation, you would end up working four days one

5  week and four days the next week during this biweekly pay

6  period?

7    A.    That was the plan, yeah.  The plan would be to

8  work, if your shift was -- it would be a ten-hour shift a

9  day is what they wanted, and you'd put in your eighty hours

10  for two weeks.

11    Q.    Well, what do you recall, then, about when you

12  were with Vencor?  What was your understanding of how your

13  pay was going to work?

14    A.    My pay?

15    Q.    Yes.

16    A.    The way that I knew it was the way I was paid, was

17  they gave me my wages.  And then if I were to work anything

18  above the eighty hours, they would just pay me a straight

19  hourly pay.

20    Q.    Okay.  So when you said they would give you your

21  wages, what was that?  What was that for?  What was that

22  amount?

23    A.    I don't know.  If I went off an hourly wage, I

24  would multiply it by 80 and come up with a figure.

25    Q.    And I'm not trying to put words in your mouth.  So

1    I understand this, in other words, you would be paid 80

2    hours for the biweekly pay period, but then anything above

3    that, you would get straight time?

4        A.    Yes.   On a two-week paycheck, it would be 80

5    hours.   And anything above and beyond that was a straight

6    hourly -- hourly pay.

7        Q.    Is that what would just happen or is that what you

8    were told would happen?

9        A.    Like I said, I recall getting this pink sheet that

10   had my hourly rate.   I would make sure that that times 80

11   equaled my check.   And plus that and any amount of hours

12   that I worked over.   That's all I remember.

13       Q.    Do you know whether Mr. Strate told you you would

14   get paid for at least the eight shifts or the equivalent 80

15   hours per pay period?

16       A.    Definitely not, because there were weeks where if

17   you were under, you would only get paid what you worked.

18       Q.    So you wouldn't get a minimum base of 80 hours?

19       A.    Near the end when I left my employment, I wasn't

20   getting 80 hours.

21       Q.    And what about when you -- let's say 1998 and

22   1999?

23       A.    If I worked my 80 hours, yeah, I would get a --

24       Q.    Well, no, that really wasn't the question.

25             You mentioned something about if you worked

1    A.    Yeah, yeah.

2    Q.    So you didn't fudge these records.

3    A.    No.  There's no way to.  I mean, where I

4    worked -- you can see in this instance where I would work

5    an hour extra, I would put eleven hours, so the next day I

6    worked nine hours.

7    Q.    So you always put the time down.  Is that right?

8    A.    To the best of my knowledge, yes.

9    Q.    Okay.  So your payroll records would show what you

10   were paid for during that pay period and whether you were

11   paid for that extra hour during that pay period; isn't that

12   true?

13   A.    Payroll is this.  You're talking paychecks now?

14   I'm sorry.

15   Q.    Computer printout.

16   A.    There was one instance there that I know there was

17   a problem on the sheet.

18   Q.    What problem?

19   A.    I don't remember at this time.  I could look it up

20   and let you know, but I can't remember.

21   Q.    What kind of problem?

22   A.    I think it had to do with working over forty hours

23   in one week.

24   Q.    And what was the problem?

25   A.    I can't remember.  I wish I could.  I'm sorry.

1    being paid for hours worked on any other occasion?

2        A.    No, I did not.   The only other instance I can

3    remember is actually I worked more and they underpaid me.

4    I can't remember exactly when, though.

5        Q.    Okay.   You understood my question?

6        A.    Oh, yeah.   I was never one as an employee that

7    was -- I would get sick very infrequently and not want

8    to -- not much for vacations.   When I was at Eckerd's I

9    would take my vacation pay in lieu of going on vacation.

10        Q.    Well, are there any other times where you weren't

11    paid for the time that you worked over 80 hours in a pay

12    period and then didn't take -- didn't make up that time

13    somewhere else?

14        A.    No.   That happened quite frequently.

15        Q.    That what?

16        A.    It would happen quite frequently where I would

17    work an hour here or an hour there, and then we would take

18    it off on the next day or the next available day that we

19    could.

20            But for the two weeks, not necessarily a

21    forty-hour workweek, but for the two weeks, we would make

22    sure it was 80 hours.   In this one case --

23        Q.    But would you always record your hours accurately

24    on these time sheets, which I think was your testimony

25    before?

1     A.   I would have to say no because I wouldn't know how

2  to contact them.

3          MS HOWARD:  David, unless you want me to, I

4  don't really think it's necessary for me to mark this.

5          MR. LINESCH:  Are you just going to

6  authenticate?

7          MS HOWARD:   Yeah.

8  BY MS. HOWARD:

9     Q.   I've handed you a document entitled Plaintiff's

10 Response to Defendant's First Set of Interrogatories.  Are

11 you familiar with this document?

12    A.   Yes.

13    Q.   Is that your signature on the last page?

14    A.   Yes, it is.

15    Q.   Did you review and help prepare these

16 interrogatories prior to signing the document?

17    A.   Did I review and --

18    Q.   Did you prepare the answers to this document?

19    A.   Yes, yes.

20    Q.   Turn to Page 3.  You listed two employees there

21 under this question.  We had also asked when you

22 communicated with them or contacted them about this matter.

23          So for Mr. Izadi, when did you communicate or

24 contact him with respect to your allegations against

25 Vencor?

1    A.    I can't say for sure.  I don't remember the exact

2    time.  I would say it would have to be somewhere in the

3    year 2000, I think.

4    Q.    Well, if your lawsuit was filed approximately

5    November 2000, did you contact him before you filed your

6    lawsuit?

7    A.    I know I talked to him about this issue, so, I

8    mean, I technically spoke to him about it, yeah, it was

9    right around that time.

10    Q.    Did you ever speak to Mr. Izadi about it while you

11    were still employed?

12    A.    No.

13    Q.    Did you ever speak to Mr. Kazerounian?  Sorry if

14    I'm mispronouncing his name.  Did you ever talk to him

15    about it while you were still employed?

16    A.    No.

17    Q.    So it was sometime after your termination?

18    A.    Right.

19    Q.    Do you know whether it was after you filed your

20    lawsuit?

21    A.    I don't believe so.  I think it was before.  It

22    might have been -- it was right in that time period.  I

23    don't know exact, though.

24    Q.    When is the last time you spoke with Mr. Izadi?

25    A.    Maybe a year, year and a half.  Maybe a year, year

1   and a half.

2       Q.    So somewhere in 2001?

3       A.    Yes.

4       Q.    Are you friends with him?

5       A.    Yes.

6       Q.    But you haven't spoken to him in a year, year and

7   a half?

8       A.    No.

9       Q.    On that particular occasion, did you talk about

10  the lawsuit?

11      A.    I believe I mentioned it to him to see what he had

12  thought about it.  Yeah, I'm sure I did.

13      Q.    What did he say?

14      A.    He really had no comment.  He, in fact -- if I

15  remember right, he wasn't sure what he was going to do, and

16  I don't remember him ever really getting back to me on any

17  of the issues.

18      Q.    Who does he work for now?

19      A.    As far as I know, the hospital listed, All

20  Children's.

21      Q.    All Children's Hospital?

22      A.    Right.

23      Q.    Okay.  We'll get to that page in a minute.  When

24  is the last time you spoke with -- I will use Dante since

25  that's easier to say.

1    A.    Dante is probably a year and a half or longer.

2    Q.    And what did he say about the lawsuit?

3    A.    I haven't had any comment from him at all.  I

4    spoke to him.  He didn't even respond.  So I tried to call

5    him another time and I left a message for him, and I didn't

6    hear back from him.

7    Q.    When you spoke to each of these gentlemen, what

8    were you saying to them?

9    A.    Just voicing my concerns, to see if I was correct

10   in what I felt.

11   Q.    Did you ask them to join the lawsuit?

12   A.    Initially I think I was feeling them out to see if

13   they would be interested in anything like that.  I don't

14   think I got a response.  That's why I did what I did and

15   saw Mr. Linesch.

16   Q.    Have they ever shown any interest in joining the

17   lawsuit as far as you know?

18   A.    Not to me, no.

19   Q.    Well, as far as you know.

20   A.    No, not that I know of.

21   Q.    And when you said when you spoke to Dante about

22   it, he really had no comment about it?

23   A.    I got nothing out of Dante.

24   Q.    Are you aware of any current or former employees

25   who have given any statements in this case, like written

1    statements in connection with your claims?

2        A.    No.

3        Q.    Do you know of anybody who has given any oral

4    statements in connection with this case?

5        A.    No.  As far as I know I'm the only person that's

6    involved.

7        Q.    Okay.  Turning to Number 6, which is Page 7.

8              Now, you listed Mr. Izadi and Dante.  Do you

9    know what information they have that might support your

10   case?

11       A.    Anything -- no facts.  I have assumptions.

12       Q.    Okay.  And what are those assumptions?

13       A.    That they both worked a lot of overtime,

14   especially during my FMLA.

15       Q.    Do you know if Mr. Izadi and Dante also filled out

16   time sheets?

17       A.    If they were treated the same as me, yes, they

18   did.

19       Q.    Why have you listed All Children's Hospital?

20       A.    I think it asks their place of employment.

21       Q.    So they both work at the same place?

22       A.    Yeah.  Actually where I got that was from -- off

23   the internet.  We're required to keep our current employer

24   listed with the Board of Pharmacy.

25       Q.    There's no other reason you've listed that

1    organization, though?

2       A.   No.

3       Q.   Okay.  Besides Dante and Mr. Izadi, have you

4    spoken with any other current or former employees of Vencor

5    concerning this matter?

6       A.   Not that I can remember, no.

7       Q.   And turning to Page 10, Interrogatory Number 9, is

8    the answer, "none," still accurate?

9       A.   None.

10       Q.   It's not accurate?

11       A.   No.  I don't know of any others.

12       Q.   Okay.  So it is accurate.

13       A.   Yeah, it is accurate.

14       Q.   Do you know of anyone else who wants to join the

15    lawsuit?

16       A.   No, I don't.

17          MS. HOWARD:  David, I had asked Gina to have

18    available your document production to us so I wouldn't have

19    to bring two stacks down.  Do you have that handy?

20          I just want to ask him a few questions about

21    some of the Bates stamped documents you have produced.

22          MR. LINESCH:  Okay.  This is what we gave you.

23          MS. HOWARD:  This is what you produced to us,

24    yeah.  It would be Bates stamped -- I don't even think I

25    brought all of it with me, but I would imagine it's

1    STATE OF FLORIDA          )

2

3    COUNTY OF PINELLAS        )

4

5          I, the undersigned authority, certify that DAVID

6    MACKENZIE personally appeared before me and was duly sworn

7    on the 6th day of June, 2002.

8

9

10          WITNESS my hand and official seal this 14th

11   day of June, 2002.

12

13

14

15

16                Susan M. Valsecchi, RPR

17                Notary Public - State of Florida

18                My Commission No.  DD 046263

19                My Commission Expires:  9/10/05

20

21

22

23

24

25

# EXHIBIT

# 2



# FISHER & PHILLIPS LLP
## ATTORNEYS AT LAW

www.laborlawyers.com



**Atlanta**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326-1125
(404) 231-1400 Tel
(404) 240-4249 Fax

Writer's Direct Dial:
(404) 240-4291
Writer's Email Address:
choward@laborlaywers.com

June 28, 2002

**Via Facsimile and US Mail**

David J. Linesch, Esq.
The Linesch Firm
700 Bee Pond Road
Palm Harbor, Florida 34683

      Re:    *Mackenzie v. Kindred Hospitals East, LLC*
             *Case No. 8:00-CV-2405-T23B*

Dear David:

    Our client hereby offers what amounts to full relief (actually somewhat more than that amount) for Mr. MacKenzie's claims. As you will see, Mr. MacKenzie's alleged back overtime wages are well below $1000. If he rejects this offer, his pursuit of this matter would, in our opinion, unnecessarily cause the parties to incur mounting attorney's fees. Therefore, we have made this offer to place upon him the responsibility for any litigation expenses he continues to accrue. The offer for full relief in no way represents an admission that Mr. MacKenzie is entitled to this relief. In fact, we submit that Mr. MacKenzie's pay and duties will satisfy the test for the professional exemption under the Fair Labor Standards Act.

    Specifically, Kindred offers him the amount of $600.00 as alleged unpaid overtime compensation, plus an additional amount of $600.00, for a total of $1,200.00. In addition, Kindred offers him his costs accrued to date within the meaning of Fed. R. Civ. P. 54(d)(1). Finally, Kindred offers to pay only so much of his attorney's fees as we hereafter mutually agree to or as are determined by the Court to be due under the legal principles governing attorney's-fees awards under FLSA Section 16(b).

    The calculations used to produce the offer for alleged unpaid overtime compensation are based on the greatest sum that Mr. MacKenzie could recover for the period in question rounded up to $600, and we then doubled that amount to account for liquidated damages.

Atlanta · Chicago · Fort Lauderdale · Irvine · Las Vegas · New Orleans · Oakland · Orlando · San Diego

We based the overtime computation upon a straight-time hourly rate of $33.99, representing Mr. MacKenzie's annualized salary divided by 2080 hours. We applied this rate throughout the entire period, even though his salary was slightly lower in the beginning of the relevant time period. We then calculated overtime as follows:

$$(\$33.99 \times .5) \times 32.5 \text{ (alleged overtime hours)} = \$552.33$$

Mr. MacKenzie testified that he reported all of his hours worked on his time sheets and that the time sheets were accurate. He also testified, which is supported by the payroll records, that he always received straight-time for those hours exceeding forty or thirty in a workweek. Because he received straight-time for all hours over forty in a workweek, the most he would be entitled to is additional half-time for any alleged overtime hours. Based upon our review of the time sheets, Mr. MacKenzie worked, at most, 32.5 alleged overtime hours. If you have reason to believe that our computation is incorrect, please advise us and we will re-evaluate it.

If Mr. MacKenzie does not accept this offer for full relief, we will continue to assert that he is exempt from overtime pursuant to the professional exemption. In support of our position, we submit that during the relevant time period Mr. MacKenzie testified, and the records support that testimony, that no improper deductions were made from his pay. While he worked an anticipated 80-hour shift schedule, each pay period he received at least the predetermined payment of 80 times his annualized salary divided by 2080 hours, and he received a similarly-computed guarantee based upon a lower number of hours while he worked a reduced schedule after returning from FMLA leave. Likewise, although Mr. MacKenzie tried to downplay his duties, we believe that we showed that there were significant differences between his job in a long-term healthcare setting and that of a retail pharmacist, that the job does require the consistent exercise of discretion and judgment, and that the knowledge he acquired through his schooling was essential to performing the principal functions required of a pharmacist.

If you have questions regarding the above offer, please call us. Otherwise, we look forward to hearing from you.

Sincerely yours,

Christine E. Howard
For Fisher & Phillips LLP

CEH:sas
Enclosure

# EXHIBIT

# 3



# FISHER & PHILLIPS LLP
## ATTORNEYS AT LAW

www.laborlawyers.com



**Atlanta**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326-1125
(404) 231-1400 Tel
(404) 240-4249 Fax

Writer's Direct Dial:
(404) 240-4291
Writer's Email Address:
choward@laborlaywers.com

July 2, 2002

**Via Facsimile and US Mail**

David J. Linesch, Esq.
The Linesch Firm
700 Bee Pond Road
Palm Harbor, Florida 34683

     Re:    *Mackenzie v. Kindred Hospitals East, LLC*
             *Case No. 8:00-CV-2405-T23B*

Dear David:

We received your letter dated July 1, 2002, and we will attempt to address the concerns outlined therein.

First, you asked whether we would "allow" the "settled MacKenzie claim" to serve as a "collective plaintiff" for purposes of prosecution of the collective claims of the alleged putative class. We are not sure what you mean by having the "settled claim" serve as a collective plaintiff. If you are asking whether we would allow the case to continue without Mr. MacKenzie as a party, we do not believe that this decision is ours to make. What we do expect is for Mr. MacKenzie to dismiss his claims, and further expect that he will no longer be a party to this case should you attempt to pursue the matter in some fashion despite Mr. MacKenzie's absence. Although you have brought this matter as a collective action, no other individuals have pursued their alleged claims, and we would thus submit that there is no case or controversy over which the Court would have jurisdiction.

Second, you state that it would be inappropriate to allow any compelled settlement to extinguish the rights of putative class members in the collective action. Unlike a Rule 23 action in which the class has been certified, any potential FLSA claimants must pursue their own claims even if they do so within the framework of a collective action. The right to bring their own claims is not extinguished, but rather only the vehicle by which they may pursue their claims will be effected. Specifically, assuming the court concludes that there is no case

or controversy to decide because Mr. MacKenzie has been afforded full relief and is no longer a party to this action, then the alleged potential claimants may pursue their claims not through the instant collective action, but under their own proceedings, if any.

If you have any further questions, please let us know.

Sincerely,

Christine E. Howard
For Fisher & Phillips LLP

CEH:sas

# EXHIBIT

# 4

United States District Court, S.D. Florida.

**Daniel SANTIELICES, on behalf of
himself and all others similarly situated,
Plaintiff,**
v.
**CABLE WIRING, INCORPORATED, a
Florida corporation, South Florida Cable
Contractors, Inc., a Florida corporation
Defendants.**

No. 98-7489CIV.

Sept. 28, 1999.

ORDER

GARBER, Magistrate J.

*1 THIS CAUSE is before this Court on Plaintiff's Motion to Allow Notification of Potential Class Members Pursuant to 29 U.S.C. § 216(b) [DE- 35]. No hearing was held on this matter.

Both parties agree that the controlling case in this matter is *Dybach v. State of Fla. Dept. of Corrections,* 942 F.2d 1562 (11th Cir.1991). Indeed, Plaintiff states that he "defined the proposed class with *Dybach* in mind." Santelices Memorandum, p. 4. In *Dybach,* the Eleventh Circuit held that a district court has the authority to issue an order pursuant to 29 U.S.C. § 216(b) requiring notice to similarly situated employees when such an order is sought by a plaintiff. *Id.* at 1567. The court, however, specifically instructed that "*[b]efore* determining to exercise such power ... the district court should satisfy itself that there are other employees ... who desire to 'opt in' and who are 'similarly situated ....' ' *Id.* at 1567-68 (emphasis added).

Plaintiff concedes that he has provided no evidence that others, similarly situated, desire to opt-in. Plaintiff's Reply in Support of His Motion to Allow Notification of Potential Class Members Pursuant to 29 U.S.C. § 216(b) states "[t]he *sole* means of proving whether a cable installer driver desires to opt-in or not is to present the driver with the opportunity to opt-in." Santelices Reply Memorandum, page 1 (emphasis supplied). Plaintiff contends there is no way for this Court to determine whether there are others who may desire to opt-in without issuing the requested Order. Since The Eleventh Circuit stated that such determinations are to be made beforehand Plaintiff's motion must be denied.

Accordingly, upon due consideration of the papers filed by counsel, it is hereby

ORDERED that Plaintiff's Motion to Allow Notification of Potential Class members pursuant to 29 U.S.C. § 216(b) is DENIED WITHOUT PREJUDICE.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

DAVID MACKENZIE,

     Plaintiff,

                                             CASE NO. 8:00-CV-2405-T-23B

v.

                                             COLLECTIVE ACTION

KINDRED HOSPITALS EAST, L.L.C.
f/k/a VENCOR HOSPITALS EAST, L.L.C.,

     Defendant.

_____/

## CERTIFICATE OF SERVICE

This is to certify that I have this 31st of July, 2002, served a true and correct copy of

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S**

**OFFER OF JUDGMENT** upon the following individual by depositing same in the United States

Mail, postage prepaid, addressed as follows:

                    David J. Linesch
                    The Linesch Firm
                    700 Bee Pond Road
                    Palm Harbor, FL 34683

                    _____
                    Of Counsel