# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

DAVID MACKENZIE,

       Plaintiff,

                                **CASE** NO. 8:00-CV-2405-T-23B

v.

                                **COLLECTIVE** ACTION

KINDRED HOSPITALS EAST, L.L.C.
f/k/a VENCOR HOSPITALS EAST, L.L.C.,

       Defendant.

_____/

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Defendant, Kindred Hospitals East, L.L.C., through undersigned counsel and pursuant to

Federal Rule of Civil Procedure 12(b)(1), respectfully submits its Memorandum of Law in

Support of Defendant's Motion to Dismiss. For reasons discussed in more detail below,

Defendant's Motion should be granted and Plaintiff's claims dismissed with prejudice because

there is no longer a judicable case or controversy before the Court and it therefore lacks subject

matter jurisdiction over the instant claims.

### I. INTRODUCTION AND BACKGROUND

Plaintiff brings this action under Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. §

216(b), alleging that he and potentially other similarly-situated pharmacists employed by Defendant

are entitled to overtime compensation and damages under the Act. On January 11, 2002, this Court

granted Defendant's Motion Dismiss all prepetition claims, which consist of all alleged violations of

the FLSA committed before September 13, 1999. Because Plaintiff was terminated from his position

in June, 2000, the period of time in which he can recover any damages for any allegedly unpaid



overtime is limited to September 13, 1999 through June, 2000.[1]

As part of the discovery process, Defendant has produced payroll and timecard records for Plaintiff covering the relevant period. These records indicate that, at most, Plaintiff worked a total of 32.5 hours in excess of 40 in a work week during the period from September 13, 1999 through his termination in June, 2000. Plaintiff agreed in his deposition that these records are accurate. (Plaintiff's Depo., pp. 139-140; attached as Ex. 1). Plaintiff also testified that he was paid at his regular rate for all hours in excess of 40 in a work week during the given period. (Plaintiff's Depo., pp. 104-105). If Plaintiff were entitled to overtime, which Defendant denies, he would only be entitled to half time for those 32.5 hours, which at his rate of pay is $552.33.

Given this negligible amount of potential overtime liability and the mounting expense of the litigation, Defendant chose to offer Plaintiff full relief. (*See*, Defendant's June 28, 2002 letter, attached as Ex. 2). Defendant thus served Plaintiff with a Rule 68 offer of judgment in the amount of $1200.00, plus his costs accrued to date, and attorneys' fees subject to a mutual agreement or court-ordered award. Defendant arrived at that figure by taking the base potential overtime liability described above, doubling it to account for potential liquidated damages under the FLSA, and then rounding up to insure that Plaintiff was offered full and complete relief.

Plaintiff responded to the Rule 68 offer by saying it would be "inappropriate to allow any compelled settlement under Rule 68 to extinguish the right to the putative class members in this collective action." (Ex. 3). Plaintiff did not explain how any "putative class members" would be effected by an acceptance of the Rule 68 offer. Defendant responded to Plaintiff's July 1 letter and

---

[1]The period of time covering Plaintiff's potential damages is further limited by the fact that Plaintiff applied for and received extended leave under the Family Medical Leave Act in late 1999.

explained that "unlike a Rule 23 action in which the class has been certified, any potential FLSA claimants must pursue their own claims even if they do so within the framework of a collective action. The right to bring their own claims is not extinguished, but rather only the vehicle by which they may pursue their claims will be affected." (Defendant's July 2, 2002 letter, attached as Ex. 4). Defendant submits this was an appropriate offer of full relief under Rule 68 and that its explanation in its July 2 letter is legally accurate. This seems particularly true given the fact that Plaintiff has admitted that no other "putative class members" have expressed any interest in joining this lawsuit despite the fact that Plaintiff has contacted at least two of those potential persons. (Plaintiff's Depo., pp. 154-159).

Defendant's Rule 68 Offer expired on July, 15, 2002 and Plaintiff filed a Motion to Strike Defendant's Offer of Judgment the same day.   Plaintiff's Motion to Strike is pending before the Court. As of the date of this Motion, Plaintiff has not moved the Court for class certification or for notice to any persons "similarly situated" to him.

## II. ARGUMENT AND CITATION OF AUTHORITY

Defendant's offer of full relief to the only Plaintiff in this case dictates the dismissal of the action with prejudice. Article III of the United States Constitution only confers jurisdiction to the federal courts over "cases and controversies." Where a party no longer has a personal interest in the litigation because he has received full relief, his claims are effectively mooted and the court no longer has subject matter jurisdiction. Nothing about the nature of this case, including the fact that it is styled as a Section 216(b) "collective action," prevents the application of this doctrine. For these reasons, as discussed in more detail below, Plaintiff's claims must be dismissed with prejudice.

**A.** **There Must Be a "Case or Controversy" Under Article III for a Court to Retain Subject Matter Jurisdiction.**

As discussed above, Article III of the U.S. Constitution confers on the federal courts jurisdictions over cases and controversies. Holstein v. City of Chicago, 29 F.3d 1145, 1147 (7th Cir. 1994). Both litigants must have a personal interest in the case not only at the beginning of the litigation, but their interest must persist throughout the course of the litigation. Id. (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980)). "A case becomes moot when the dispute between the parties no longer rages, or when one of the parties loses his personal interest in the outcome of the suit." Id. (citing Banks v. NCAA, 977 F.2d 1081, 1085 (7th Cir. 1992), cert. denied, 508 U.S. 908 (1993)). "Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed.R.Civ.P.12(b)(1), because he has no remaining stake." Id. (internal quotations and citations omitted).

This fundamental and Constitutional case and controversy requirement is not limited to single plaintiff actions. As the United States District Court for the Southern District of Florida has stated,

> Article III limitations imposed by the mootness doctrine necessarily apply to class actions. *Dallas Gay Alliance*, 719 F.Supp. At 1384. "A putative class representative who alleges no individual injury may not seek relief on behalf of himself or any other member of the class." Id. As explained in Lusardi, "when claims of the named plaintiffs become moot before class certification, dismissal of the action is required." Lusardi, 975 F.2d at 974. The Eleventh Circuit has stated:

-4-

> In a class action, the claim of the named **plaintiff**, who
> seeks to represent the class, must be **live both** at the
> time he brings the suit and when the **district** court
> determines whether to certify the **putative class**. If the
> plaintiff's claim is not live, the court lacks **a justiciable**
> controversy and must dismiss the **claim as** moot.
> Tucker v. Phyfer, 819 F.2d 1030, **1033 (11**th Cir.
> 1987).
>
> Stated another way, a plaintiff cannot **represent a** class
> of which he is not a member. Bailey v. **Patterson**, 369
> U.S. 31, 31-32 (1962). If the claim of **the class** action
> plaintiff is moot, the action must be **dismissed** under
> Fed.R.Civ.P.12(b)(1).

Labora v. MCI Telecommunications Corp., 1998 WL 1572719 (S.D.Fla. 1998)[2], *aff'd*, 204 F.3d

1121 (11th Cir. 1999)(unpublished table decision), *cert. denied*, **529** U.S. 1123 (2000).

**B.     Courts Have Applied Article III Principles To Dismiss Multiple Plaintiff and Class
        Actions.**

        Courts from both within the Eleventh Circuit and elsewhere have applied these Article III case

and controversy requirements to dismiss cases purportedly **brought on** behalf of multiple plaintiffs.

For example, in Holstein, the Seventh Circuit affirmed a district **court** decision dismissing the claims

of two named plaintiffs who purported to sue both individually and on behalf of all others similarly

situated. 29 F.3d 1145. In analyzing the application of Article III case and controversy requirements

and the propriety of the defendant's motion to dismiss, the **court noted** that "mootness requirements

are somewhat different where the plaintiff attempts to represent a class." Id. at 1147. The court went

on to explain those differences, adding that where a district **court has** certified a class prior to the

expiration of a plaintiff's claims, mootness is avoided. Id. (citing **Geraghty**, 445 U.S. at 398). The

court, however, held that the case before it did not qualify for **this limited** exception to the mootness

---

        [2]A copy of this decision is attached as Exhibit 5.

doctrine.  Because the defendant had already offered the individual plaintiff full relief by dismissing

his parking ticket, the court held that the named plaintiff "cannot claim the benefit of this exception

to the mootness doctrine because the district court did not certify the class; indeed, [the plaintiff] did

not even move for class certification prior to the evaporation of his personal stake. [The plaintiff],

then, cannot avail himself of the class action exception to the mootness doctrine."  Id.

District courts from within the Seventh Circuit have taken the Holstein decision at face value

and held that, at least where the only named plaintiff in an action has yet to move for class

certification when an offer of full relief is tendered, his claims are effectively mooted by that offer and

dismissal is appropriate.  See, Wiskur v. Short Term Loans, LLC, 94 F.Supp.2d 937

(N.D.Ill.2000)(granting defendant's motion to dismiss because its offer of judgment came before a

motion for class certification was sought and was for an amount greater than plaintiff could have

received had she gone to judgment, thus making the claim moot).[3]  Courts in other jurisdictions have

reached similar conclusions.  See, e.g., Ambalu v. Rosenblatt, 194 F.R.D. 451 (E.D.N.Y.

2000)(granting defendant's motion to compel acceptance of an offer of judgment and to dismiss the

complaint because that claim was mooted where no class had been certified and no motion had been

made for certification).  As the Ambalu court stated, "[h]aving offered all that [plaintiff] could hope

_____

[3]Other district courts from within the Seventh Circuit have distinguished Holstein in
situations where the named plaintiff has moved for class certification during the pendency of the
Rule 68 offer.  See, e.g., Asch v. Teller, Levit & Silvertrust, P.C., 200 F.R.D. 399 (N.D.Ill. 2000);
Kremmintzer v. Cabrera & Raphen, P.C., 202 F.R.D. 239 (N.D.Ill. 2001).  In addition, courts
have distinguished situations where motions for class certification were filed prior to a defendant's
rule 68 offer.  See, e.g., Greisz v. Household Bank, 176 F.3d 1012; Whitten v. ARS National
Services, Inc., 2001 WL 1143238 (N.D.Ill.); Silver v. National Telewire Corp., 2000 WL
1480269 (N.D.H.).  These distinctions are meaningless in the instant case, given the fact that it is
undisputed that defendant made its Rule 68 offer of judgment prior to any motion for class
certification.

to recover through this litigation, there is no justification for taking the time of the court and the defendant in the pursuit of a minuscule individual claim which defendant has. . .satisfied." Ambalu, 194 F.R.D. at 453 (citations and internal quotations omitted).

The Southern District of Florida has applied similar reasoning to dismiss putative class actions even where no formal offer of judgment was made.  In Labora, a single named plaintiff filed a class action complaint alleging the defendant had engaged in improper and duplicative billing practices. 1998 WL 1572719.  The defendant phone company, rather than incurring substantial legal expenses, chose to immediately credit the plaintiff's account for the nominal amount he claimed he had been mischarged. Id. at *1.  Citing Holstein at length, as well as Eleventh Circuit case law applying Article III limitations to class actions, the court held that the tender of full relief to the lone named plaintiff mooted his case and dismissed his complaint with prejudice. Id. at *3.  The court further held that the lone named plaintiff's request for costs and interest did not create a case or controversy. Id.

**C.      The Application Of Article III Principles To An FLSA Collective Action.**

The vast majority of cases applying these Article III principles to multiple plaintiff, class, or collective actions have arisen in the context of Rule 23 class actions.  Nevertheless, the reasoning behind the application of these principles in a Rule 23 class action is even more compelling in the Section 216(b) context under its "opt-in" scheme.[4]  Under that scheme, potentially "similarly situated" plaintiffs must affirmatively choose to join the lawsuit in order to be bound by its outcome. Those potential plaintiffs who are similarly situated to a named plaintiff in a § 216(b) action and who

---

[4]Defendant acknowledges that Rule 23 is in no way controlling over Section 216(b) actions, as discussed at length in Section B.1. of its Response to Plaintiff's Motion to Strike Defendant's Offer of Judgment.  Nevertheless, the "opt-in" nature of Section 216(b) arguably makes it even more amenable to the application of Article III principles to individual plaintiffs as described herein.

choose not to opt in to that action do nothing to affect their rights in any way.  As one court put it,

> This "opt-in" requirement distinguishes § 216(b) collective actions from class actions brought under Rule 23 of the Federal Rules of Civil Procedure. Rule 23 provides that, in the case of a class certified pursuant to subsection (b)(1) or (b)(2), all class members are bound by the court's decision irrespective of their desires and that, in the case of a class certified pursuant to subsection (b)(3), they are bound by the court's decision unless a class member notifies the court prior to resolution of the case that she desires to opt out of the class.  Under 216(b), in contrast, a person is not considered a member of the "collective action" and will not be bound by or benefit from the court's judgment unless the person has filed a written consent with the court and thereby affirmatively "opted in" to the suit.

Garner v. G.D. Searle Pharmaceuticals & Co., 802 F.Supp. 418, 421 (M.D. Ala. 1991)(citing LaChapelle v. Owens-Illinois, Inc., 513 F.2d 286, 288 (5th Cir. 1975)).[5]  Any concern over the rights of and effects on potential putative class members that might inhibit a court from dismissing a named plaintiff's claims on Article III grounds in a Rule 23 case therefore does not exist under Section 216(b).  It is legally impossible under the latter scheme for any person who has not affirmatively opted in to the lawsuit to be in any way bound by the outcome of the case.

Defendant's research has revealed only one case to date in which these principles have been discussed in the FLSA context.    In Yates v. Applied Performance Technologies, Inc., 205 F.R.D. 497 (S.D.Ohio 2002), the district court declined to compel the named plaintiffs to accept their employer's offers of judgment strictly on the ground that the amount of overtime allegedly owed to

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

each named plaintiff was in dispute. Id. at 503 n.6. Plaintiffs in Yates claimed that they could not adequately evaluate the offers of judgment because the defendant had refused to produce payroll and time sheet records for the named plaintiffs. Id. at 502. The court was therefore not in a position to determine whether the named plaintiffs had been offered full relief and thus could not apply the mootness doctrine to dismiss their claims. The court noted, however, that "[i]f there was no question concerning the amount of overtime pay to which each plaintiff was entitled, this would be more analogous to Ambalu." Id. at 502-503.[6] There is no dispute in this matter, however, that the lone named plaintiff has been offered more than full relief. (See, p.2, *supra*).

**D.    The Application Of Article III Principles And The Dismissal Of Plaintiff's Claim Is Appropriate.**

The undisputed facts of this case make it a perfect candidate for the application of Article III principles and for dismissal. Plaintiff claims he is owed overtime under the FLSA for the period from September 13, 1999 through June, 2000. Plaintiff completed his own time cards during this period, Defendant has produced those cards to Plaintiff, and Plaintiff agrees those cards are accurate. If Plaintiff were to proceed to trial, it is undisputed that he could not be awarded more than the amount of his alleged unpaid overtime, an equal amount in liquidated damages, plus his costs and attorneys' fees. Defendant has already offered Plaintiff *more than* that amount, but Plaintiff nevertheless seeks to continue this litigation. Plaintiff seeks to continue despite the fact that he is the only Plaintiff in the lawsuit, that he is unaware of any other pharmacists who might wish to join the lawsuit, that he has not yet moved for class certification, and that his acceptance of full relief cannot possibly affect

_____

[6]As discussed above, Ambalu held that no case or controversy existed where the named plaintiff in a class action had been offered full relief under Rule 68 and dismissed the plaintiff's claims.

-9-

the rights of any other pharmacists.

The principles and reasoning discussed in the sections **above** make it clear that Plaintiff no longer has an interest in this litigation.   Under Article III **of the** U.S. constitution, he therefore presents no judicable case or controversy to this Court and **his claims** must be dismissed for lack of subject matter jurisdiction.

### III. CONCLUSION

For all the reasons discussed herein, Plaintiff's claims **are moot** and he no longer presents a judicable case or controversy, thereby depriving this court of **subject matter** jurisdiction.   Defendant's Motion to Dismiss should **therefore** be granted.

This _____ day of August, 2002.

_____
Carlos J. Burruezo
Florida Bar No. 843458

**FISHER & PHILLIPS LLP**
1250 Lincoln Plaza
300 South Orange Avenue
Orlando, Florida 32801
(407) 541-0888
(407) 541-0887 (FAX)

and

Christine E. Howard
Ga. Bar No. 370097
Fla. Bar No. 872229
Jeffery E. Robertson
Ga. Bar No.609739

**FISHER & PHILLIPS LLP**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, Georgia 30326
(404) 231-1400
(404) 240-4249 (FAX)

**ATTORNEYS FOR DEFENDANT**

-11-

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DAVID MACKENZIE,

        Plaintiff,

                                          CASE NO. 8:00-CV-2405-T-23B

v.

                                          COLLECTIVE ACTION

KINDRED HOSPITALS EAST, L.L.C.
f/k/a VENCOR HOSPITALS EAST, L.L.C.,

        Defendant.

_____/

## CERTIFICATE OF SERVICE

This is to certify that I have this 12th of August, 2002, served a true and correct copy of

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

upon the following individual via Overnight Delivery, postage prepaid, addressed as follows:

        David J. Linesch
        The Linesch Firm
        700 Bee Pond Road
        Palm Harbor, FL 34683

                                  _____
                                 Carlos J. Burruezo

# EXHIBIT

# 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


DAVID MACKENZIE,

        Plaintiff,

vs.                             CASE NO. 8:00-CV-2405-T-23B

VENCOR HOSPITALS EAST, L.L.C.,

        Defendant.

_____/   ORIGINAL


PLACE:        The Linesch Firm
                700 Bee Pond Road
                Palm Harbor, Florida  34683

DATE:         June 6, 2002

TIME:         9:00 a.m. - 3:25 p.m.

REPORTED BY:  Susan M. Valsecchi, RPR
                Registered Professional Court Reporter
                Sixth Judicial Circuit


-------------------------------------------
DEPOSITION OF DAVID MACKENZIE
-------------------------------------------
Pages 1 - 178


VALSECCHI REPORTING
111 N. Belcher Road, Suite 206
Clearwater, Florida  33765
(727) 771-1995

1      Q.     And it was a biweekly pay period?

2      A.     You would receive a check every two weeks.

3      Q.     Do you recall it being discussed that it was -- as

4   far as expectation, you would end up working four days one

5   week and four days the next week during this biweekly pay

6   period?

7      A.     That was the plan, yeah.  The plan would be to

8   work, if your shift was -- it would be a ten-hour shift a

9   day is what they wanted, and you'd put in your eighty hours

10  for two weeks.

11     Q.     Well, what do you recall, then, about when you

12  were with Vencor?  What was your understanding of how your

13  pay was going to work?

14     A.     My pay?

15     Q.     Yes.

16     A.     The way that I knew it was the way I was paid, was

17  they gave me my wages.  And then if I were to work anything

18  above the eighty hours, they would just pay me a straight

19  hourly pay.

20     Q.     Okay.  So when you said they would give you your

21  wages, what was that?  What was that for?  What was that

22  amount?

23     A.     I don't know.  If I went off an hourly wage, I

24  would multiply it by 80 and come up with a figure.

25     Q.     And I'm not trying to put words in your mouth.  So

1    I understand this, in other words, you would be paid 80

2    hours for the biweekly pay period, but then anything above

3    that, you would get straight time?

4    A.    Yes.  On a two-week paycheck, it would be 80

5    hours.  And anything above and beyond that was a straight

6    hourly -- hourly pay.

7    Q.    Is that what would just happen or is that what you

8    were told would happen?

9    A.    Like I said, I recall getting this pink sheet that

10   had my hourly rate.  I would make sure that that times 80

11   equaled my check.  And plus that and any amount of hours

12   that I worked over.  That's all I remember.

13   Q.    Do you know whether Mr. Strate told you you would

14   get paid for at least the eight shifts or the equivalent 80

15   hours per pay period?

16   A.    Definitely not, because there were weeks where if

17   you were under, you would only get paid what you worked.

18   Q.    So you wouldn't get a minimum base of 80 hours?

19   A.    Near the end when I left my employment, I wasn't

20   getting 80 hours.

21   Q.    And what about when you -- let's say 1998 and

22   1999?

23   A.    If I worked my 80 hours, yeah, I would get a --

24   Q.    Well, no, that really wasn't the question.

25         You mentioned something about if you worked

1    being paid for hours worked on any other occasion?

2       A.   No, I did not.  The only other instance I can

3    remember is actually I worked more and they underpaid me.

4    I can't remember exactly when, though.

5       Q.   Okay.  You understood my question?

6       A.   Oh, yeah.  I was never one as an employee that

7    was -- I would get sick very infrequently and not want

8    to -- not much for vacations.  When I was at Eckerd's I

9    would take my vacation pay in lieu of going on vacation.

10       Q.   Well, are there any other times where you weren't

11   paid for the time that you worked over 80 hours in a pay

12   period and then didn't take -- didn't make up that time

13   somewhere else?

14       A.   No.  That happened quite frequently.

15       Q.   That what?

16       A.   It would happen quite frequently where I would

17   work an hour here or an hour there, and then we would take

18   it off on the next day or the next available day that we

19   could.

20           But for the two weeks, not necessarily a

21   forty-hour workweek, but for the two weeks, we would make

22   sure it was 80 hours.  In this one case --

23       Q.   But would you always record your hours accurately

24   on these time sheets, which I think was your testimony

25   before?

1      A.    Yeah, yeah.

2      Q.    So you didn't fudge these records.

3      A.    No.  There's no way to.  I mean, where I

4  worked -- you can see in this instance where I would work

5  an hour extra, I would put eleven hours, so the next day I

6  worked nine hours.

7      Q.    So you always put the time down.  Is that right?

8      A.    To the best of my knowledge, yes.

9      Q.    Okay.  So your payroll records would show what you

10  were paid for during that pay period and whether you were

11  paid for that extra hour during that pay period; isn't that

12  true?

13      A.    Payroll is this.  You're talking paychecks now?

14  I'm sorry.

15      Q.    Computer printout.

16      A.    There was one instance there that I know there was

17  a problem on the sheet.

18      Q.    What problem?

19      A.    I don't remember at this time.  I could look it up

20  and let you know, but I can't remember.

21      Q.    What kind of problem?

22      A.    I think it had to do with working over forty hours

23  in one week.

24      Q.    And what was the problem?

25      A.    I can't remember.  I wish I could.  I'm sorry.

1     A.    I would have to say no because I wouldn't know how

2   to contact them.

3               MS HOWARD:  David, unless you want me to, I

4   don't really think it's necessary for me to mark this.

5               MR. LINESCH:  Are you just going to

6   authenticate?

7               MS HOWARD:   Yeah.

8   BY MS. HOWARD:

9     Q.    I've handed you a document entitled Plaintiff's

10  Response to Defendant's First Set of Interrogatories.  Are

11  you familiar with this document?

12    A.    Yes.

13    Q.    Is that your signature on the last page?

14    A.    Yes, it is.

15    Q.    Did you review and help prepare these

16  interrogatories prior to signing the document?

17    A.    Did I review and --

18    Q.    Did you prepare the answers to this document?

19    A.    Yes, yes.

20    Q.    Turn to Page 3.  You listed two employees there

21  under this question.  We had also asked when you

22  communicated with them or contacted them about this matter.

23          So for Mr. Izadi, when did you communicate or

24  contact him with respect to your allegations against

25  Vencor?

1    A.   I can't say for sure.  I don't remember the exact

2   time.  I would say it would have to be somewhere in the

3   year 2000, I think.

4    Q.   Well, if your lawsuit was filed approximately

5   November 2000, did you contact him before you filed your

6   lawsuit?

7    A.   I know I talked to him about this issue, so, I

8   mean, I technically spoke to him about it, yeah, it was

9   right around that time.

10    Q.   Did you ever speak to Mr. Izadi about it while you

11   were still employed?

12    A.   No.

13    Q.   Did you ever speak to Mr. Kazerounian?  Sorry if

14   I'm mispronouncing his name.  Did you ever talk to him

15   about it while you were still employed?

16    A.   No.

17    Q.   So it was sometime after your termination?

18    A.   Right.

19    Q.   Do you know whether it was after you filed your

20   lawsuit?

21    A.   I don't believe so.  I think it was before.  It

22   might have been -- it was right in that time period.  I

23   don't know exact, though.

24    Q.   When is the last time you spoke with Mr. Izadi?

25    A.   Maybe a year, year and a half.  Maybe a year, year

1    and a half.

2         Q.    So somewhere in 2001?

3         A.    Yes.

4         Q.    Are you friends with him?

5         A.    Yes.

6         Q.    But you haven't spoken to him in a year, year and

7    a half?

8         A.    No.

9         Q.    On that particular occasion, did you talk about

10   the lawsuit?

11        A.    I believe I mentioned it to him to see what he had

12   thought about it.  Yeah, I'm sure I did.

13        Q.    What did he say?

14        A.    He really had no comment.  He, in fact -- if I

15   remember right, he wasn't sure what he was going to do, and

16   I don't remember him ever really getting back to me on any

17   of the issues.

18        Q.    Who does he work for now?

19        A.    As far as I know, the hospital listed, All

20   Children's.

21        Q.    All Children's Hospital?

22        A.    Right.

23        Q.    Okay.  We'll get to that page in a minute.  When

24   is the last time you spoke with -- I will use Dante since

25   that's easier to say.

1      A.    Dante is probably a year and a half or longer.

2      Q.    And what did he say about the lawsuit?

3      A.    I haven't had any comment from him at all.  I

4  spoke to him.  He didn't even respond.  So I tried to call

5  him another time and I left a message for him, and I didn't

6  hear back from him.

7      Q.    When you spoke to each of these gentlemen, what

8  were you saying to them?

9      A.    Just voicing my concerns, to see if I was correct

10  in what I felt.

11      Q.    Did you ask them to join the lawsuit?

12      A.    Initially I think I was feeling them out to see if

13  they would be interested in anything like that.  I don't

14  think I got a response.  That's why I did what I did and

15  saw Mr. Linesch.

16      Q.    Have they ever shown any interest in joining the

17  lawsuit as far as you know?

18      A.    Not to me, no.

19      Q.    Well, as far as you know.

20      A.    No, not that I know of.

21      Q.    And when you said when you spoke to Dante about

22  it, he really had no comment about it?

23      A.    I got nothing out of Dante.

24      Q.    Are you aware of any current or former employees

25  who have given any statements in this case, like written

1   statements in connection with your claims?

2   A.   No.

3   Q.   Do you know of anybody who has given any oral

4   statements in connection with this case?

5   A.   No.  As far as I know I'm the only person that's

6   involved.

7   Q.   Okay.  Turning to Number 6, which is Page 7.

8        Now, you listed Mr. Izadi and Dante.  Do you

9   know what information they have that might support your

10  case?

11  A.   Anything -- no facts.  I have assumptions.

12  Q.   Okay.  And what are those assumptions?

13  A.   That they both worked a lot of overtime,

14  especially during my FMLA.

15  Q.   Do you know if Mr. Izadi and Dante also filled out

16  time sheets?

17  A.   If they were treated the same as me, yes, they

18  did.

19  Q.   Why have you listed All Children's Hospital?

20  A.   I think it asks their place of employment.

21  Q.   So they both work at the same place?

22  A.   Yeah.  Actually where I got that was from -- off

23  the internet.  We're required to keep our current employer

24  listed with the Board of Pharmacy.

25  Q.   There's no other reason you've listed that

159

1    organization, though?

2       A.    No.

3       Q.    Okay.  Besides Dante and Mr. Izadi, have you

4    spoken with any other current or former employees of Vencor

5    concerning this matter?

6       A.    Not that I can remember, no.

7       Q.    And turning to Page 10, Interrogatory Number 9, is

8    the answer, "none," still accurate?

9       A.    None.

10       Q.    It's not accurate?

11       A.    No.  I don't know of any others.

12       Q.    Okay.  So it is accurate.

13       A.    Yeah, it is accurate.

14       Q.    Do you know of anyone else who wants to join the

15    lawsuit?

16       A.    No, I don't.

17       MS. HOWARD:  David, I had asked Gina to have

18    available your document production to us so I wouldn't have

19    to bring two stacks down.  Do you have that handy?

20       I just want to ask him a few questions about

21    some of the Bates stamped documents you have produced.

22       MR. LINESCH:  Okay.  This is what we gave you.

23       MS. HOWARD:  This is what you produced to us,

24    yeah.  It would be Bates stamped -- I don't even think I

25    brought all of it with me, but I would imagine it's

1    STATE OF FLORIDA          )

2

3    COUNTY OF PINELLAS        )

4

5         I, the undersigned authority, certify that DAVID

6    MACKENZIE personally appeared before me and was duly sworn

7    on the 6th day of June, 2002.

8

9

10        WITNESS my hand and official seal this 14th

11   day of June, 2002.

12

13

14

15        _____

16        Susan M. Valsecchi, RPR

17        Notary Public - State of Florida

18        My Commission No.  DD 046263

19        My Commission Expires:  9/10/05

20

21

22

23

24

25

# EXHIBIT

# 2

# FISHER & PHILLIPS LLP
## ATTORNEYS AT LAW
www.laborlawyers.com



**Atlanta**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326-1125
(404) 231-1400 Tel
(404) 240-4249 Fax

Writer's Direct Dial:
(404) 240-4291
Writer's Email Address:
choward@laborlawyers.com

June 28, 2002

**Via Facsimile and US Mail**

David J. Linesch, Esq.
The Linesch Firm
700 Bee Pond Road
Palm Harbor, Florida 34683

     Re:   *Mackenzie v. Kindred Hospitals East, LLC*
              *Case No. 8:00-CV-2405-T23B*

Dear David:

     Our client hereby offers what amounts to full relief (actually somewhat more than that amount) for Mr. MacKenzie's claims. As you will see, Mr. MacKenzie's alleged back overtime wages are well below $1000. If he rejects this offer, his pursuit of this matter would, in our opinion, unnecessarily cause the parties to incur mounting attorney's fees. Therefore, we have made this offer to place upon him the responsibility for any litigation expenses he continues to accrue. The offer for full relief in no way represents an admission that Mr. MacKenzie is entitled to this relief.  In fact, we submit that Mr. MacKenzie's pay and duties will satisfy the test for the professional exemption under the Fair Labor Standards Act.

     Specifically, Kindred offers him the amount of $600.00 as alleged unpaid overtime compensation, plus an additional amount of $600.00, for a total of $1,200.00.  In addition, Kindred offers him his costs accrued to date within the meaning of Fed. R. Civ. P. 54(d)(1). Finally, Kindred offers to pay only so much of his attorney's fees as we hereafter mutually agree to or as are determined by the Court to be due under the legal principles governing attorney's-fees awards under FLSA Section 16(b).

     The calculations used to produce the offer for alleged unpaid overtime compensation are based on the greatest sum that Mr. MacKenzie could recover for the period in question rounded up to $600, and we then doubled that amount to account for liquidated damages.

David J. Linesch, Esq.
June 28, 2002
Page 2

We based the overtime computation upon a straight-time hourly rate of $33.99, representing Mr. MacKenzie's annualized salary divided by 2080 hours. We applied this rate throughout the entire period, even though his salary was slightly lower in the beginning of the relevant time period. We then calculated overtime as follows:

$$(\$33.99 \times .5) \times 32.5 \text{ (alleged overtime hours)} = \$552.33$$

Mr. MacKenzie testified that he reported all of his hours worked on his time sheets and that the time sheets were accurate. He also testified, which is supported by the payroll records, that he always received straight-time for those hours exceeding forty or thirty in a workweek. Because he received straight-time for all hours over forty in a workweek, the most he would be entitled to is additional half-time for any alleged overtime hours. Based upon our review of the time sheets, Mr. MacKenzie worked, at most, 32.5 alleged overtime hours. If you have reason to believe that our computation is incorrect, please advise us and we will re-evaluate it.

If Mr. MacKenzie does not accept this offer for full relief, we will continue to assert that he is exempt from overtime pursuant to the professional exemption. In support of our position, we submit that during the relevant time period Mr. MacKenzie testified, and the records support that testimony, that no improper deductions were made from his pay. While he worked an anticipated 80-hour shift schedule, each pay period he received at least the predetermined payment of 80 times his annualized salary divided by 2080 hours, and he received a similarly-computed guarantee based upon a lower number of hours while he worked a reduced schedule after returning from FMLA leave. Likewise, although Mr. MacKenzie tried to downplay his duties, we believe that we showed that there were significant differences between his job in a long-term healthcare setting and that of a retail pharmacist, that the job does require the consistent exercise of discretion and judgment, and that the knowledge he acquired through his schooling was essential to performing the principal functions required of a pharmacist.

If you have questions regarding the above offer, please call us. Otherwise, we look forward to hearing from you.

Sincerely yours,


Christine E. Howard
For Fisher & Phillips LLP

CEH:sas
Enclosure

# EXHIBIT

# 3

# THE LINESCH FIRM

*Practice Limited to Labor and Employment Law*

David J. Linesch
~Board Certified~
Labor and Employment Law

July 1, 2002

**VIA FACSIMILE**
(404) 240-4249

Christine E. Howard, Esq.
Fisher & Phillips, LLP
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA  30326-1125

Re:   <u>Mackenzie v. Vencor</u>
       Case No.  8:00-CV-2405-T-23B

Dear Christine:

We received today your Offer of Judgment in the above-referenced matter.  It would obviously be inappropriate to allow any compelled settlement under Rule 68 to extinguish the rights of the putative class members in this collective action.  Accordingly, please clarify at your earliest convenience, your position as to whether or not you would allow the "settled" Mackenzie claim to nevertheless serve as a collective plaintiff for purposes of prosecution of the collective claims of the putative class.

Sincerely,

DAVID J. LINESCH

DJL/cam

E-mail:  lineschfirm@hotmail.com
Web Site:  www.sitelogic.com/lineschfirm
700 Bee Pond Road, Palm Harbor, Florida 34683 ● Tel. (727) 786-0000 Fax: (727) 786-0974

# EXHIBIT

# 4

# FISHER & PHILLIPS LLP
### ATTORNEYS AT LAW
www.laborlawyers.com

**Atlanta**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326-1125
(404) 231-1400 Tel
(404) 240-4249 Fax

Writer's Direct Dial:
(404) 240-4291
Writer's Email Address:
choward@laborlaywers.com

COPY

July 2, 2002

**Via Facsimile and US Mail**

David J. Linesch, Esq.
The Linesch Firm
700 Bee Pond Road
Palm Harbor, Florida 34683

   Re: *Mackenzie v. Kindred Hospitals East, LLC*
     *Case No. 8:00-CV-2405-T23B*

Dear David:

  We received your letter dated July 1, 2002, **and we** will attempt to address the concerns outlined therein.

  First, you asked whether we would "allow" the **"settled** MacKenzie claim" to serve as a "collective plaintiff" for purposes of prosecution of **the colle**ctive claims of the alleged putative class. We are not sure what you mean by **having the** "settled claim" serve as a collective plaintiff. If you are asking whether we would **allow** the case to continue without Mr. MacKenzie as a party, we do not believe that this **decision is** ours to make. What we do expect is for Mr. MacKenzie to dismiss his claims, and **further expe**ct that he will no longer be a party to this case should you attempt to pursue the **matter in** some fashion despite Mr. MacKenzie's absence. Although you have brought this **matter as a** collective action, no other individuals have pursued their alleged claims, and we **would thus** submit that there is no case or controversy over which the Court would have juris**diction.**

  Second, you state that it would be inappropriate to **allow** any compelled settlement to extinguish the rights of putative class members in the **collective** action. Unlike a Rule 23 action in which the class has been certified, any potential **FLSA** claimants must pursue their own claims even if they do so within the framework of a **collective** action. The right to bring their own claims is not extinguished, but rather only the **vehicle** by which they may pursue their claims will be effected. Specifically, assuming the **court conc**ludes that there is no case

David J. Linesch, Esq.
July 2, 2002
Page 2

or controversy to decide because Mr. MacKenzie has been afforded full relief and is no longer
a party to this action, then the alleged potential claimants may pursue their claims not through
the instant collective action, but under their own proceedings, if any.

If you have any further questions, please let us know.

Sincerely,


Christine E. Howard
For Fisher & Phillips LLP


CEH:sas

# EXHIBIT

# 5

1998 WL 1572719
(Cite as: 1998 WL 1572719 (S.D.Fla.))
<KeyCite Yellow Flag>

**Page   1**

Only the Westlaw citation is currently available.

United States District Court, S.D. Florida.

Alexander J. LABORA, Plaintiff,
v.
MCI TELECOMMUNICATIONS CORPORATION, Defendant.

No. 98-1073-CIV.

July 20, 1998.

ORDER GRANTING MOTION TO DISMISS

HIGHSMITH, District J.

*1 THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss, filed June 18, 1998. For the reasons set forth below, the motion to dismiss will be granted.

PROCEDURAL BACKGROUND

On May 13, 1998, Plaintiff Alexander J. Labora ("Labora") filed a two-count class action complaint against Defendant MCI Telecommunications Corporation ("MCI"), alleging improper and duplicative billing practices. Upon receipt of the complaint, MCI apparently refunded to Labora the total alleged duplicate charges--$1.52. Currently, MCI moves to dismiss the complaint as moot.

STANDARD OF REVIEW

"Under Article III of the Constitution, it is a jurisdictional prerequisite that plaintiffs present an actual 'case or controversy." ' American-Arab Antidiscrimination Comm. v. Thornburgh, 970 F.2d 501, 506 (9th Cir.1991). A "district court may review any evidence submitted on the issue to determine if subject matter jurisdiction in fact exists." Western Trans. Co. v. Couzens Warehouse & Distributors, Inc., 695 F.2d 1033, 1038 (7th Cir.1982). "[T]he party alleging jurisdiction must support its allegation with competent proof of jurisdictional facts." Id.

Moreover, this Court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning its jurisdiction to proceed with the action. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3rd Cir.1977). Instead, the Court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists. Id.; Western Trans., 695 F.2d at 1038. Accordingly, this Court may review the affidavits submitted with MCI's motion, and accompanying documentation, which establish that Labora's claims are moot.

FACTUAL BACKGROUND

Labora has been an MCI customer, receiving residential service since February 11, 1995. Affidavit of Carol Morales, ¶ 2. Since that time he has apparently contacted MCI's customer service on occasions where he believed he ought to be issued credits and has, in fact, received such credits from MCI. Id.

On or about April 22, 1998, Labora received his telephone bill from MCI for the period March 22, 1998, through April 21, 1998 ("the April bill"). Complaint, ¶ 15. As noted above, on that bill, Labora was charged for three calls to Hollywood, Florida, all originating on March 31, 1998, at 9:32 a.m. Complaint, Exh. "A". The April bill also reflected two calls to Mexico City, Mexico, both originating on April 3, 1998, at 4:07. Id.

Labora did not contact MCI's customer service center to inquire about these calls. Morales Aff., ¶ 4. Instead, Labora filed the instant class action complaint, alleging that the charges were improper and in violation of the Communications Act of 1934 and Section 364.08(1) of the Florida Statutes. Complaint, ¶ 34. MCI contends that the total alleged duplicative charges of which Labora complains is, at most, $1.52. [FN1] Although it contends that the charges were properly billed, rather than incur substantial legal expenses, MCI

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

elected to credit Labora's account the full amount of the disputed charges. *Daniels Aff.*, ¶ 3.

> FN1. The $1.52 is as follows: 93 cents for the alleged 3/31/98 duplicate call, 49 cents for the alleged 7/02/98 duplicate call, plus 10 cents tax. *Affidavit of Majorie A. Daniels,* ¶ 2.

## DISCUSSION

**\*2** The doctrine of mootness has its source in the case or controversy limitations in Article III of the Constitution. *Dallas Gay Alliance, Inc. v. Dallas County Hosp. Dist.,* 719 F.Supp. 1380, 1384 (N.D.Tex.1989). Article III requires that "a plaintiff must make out a case or controversy between himself and the defendant; that is, the plaintiff must allege a distinct and palpable injury to himself such as to warrant his invocation of federal-court jurisdiction." *Nat'l Wildlife Fed. v. Dept. of Interior,* 616 F.Supp. 889, 889 (D.D.C.1984) (internal citations omitted); *see also Miler v. FCC,* 66 F.3d 1140, 1145-46 (11th Cir.1995), *cert. denied sub nom Nat'l Ass'n of Broadcasters v. Miller,* 517 U.S. 1155 (1996). Thus, "[m]oot cases lie beyond the judicial power because the case or controversy ceases to exist once the matter has been resolved." *Id.; see also Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 335 (1980) ("the definitive mootness of a case or controversy ... ousts the jurisdiction of the federal courts and requires dismissal of the case"); *Holstein v. City of Chicago,* 29 F.3d 1145, 1147 (7th Cir.1994) ("[o]rdinarily, simply determining a plaintiff's case is moot dictates that his claim must be dismissed for lack of subject matter jurisdiction"); *Lusardi v. Xerox Corp.,* 975 F.2d 964, 974 (3rd Cir.1992) ( "no justiciable controversy is presented ... when the question sought to be adjudicated has been mooted by subsequent developments").

"A case becomes moot when the dispute between the parties no longer rages, or when one of the parties loses his personal interest in the outcome of the suit." *Holstein,* 29 F.3d at 1147. Thus, a case will be subject to dismissal on grounds of mootness when a defendant satisfies the plaintiff's demand for relief. *Id.* (holding that plaintiff's claim was moot

because the city offered "all damages due to him"); *Lusardi,* 975 F.2d at 974 ("[s]ettlement of a plaintiff's claims moots an action"); *Rand v.. Monsanto Co.,* 926 F.2d 596, 597 (7th Cir.1991) ("[o]nce the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed.R.Civ.P. 12(b)(1), because he has no remaining stake").

Article III limitations imposed by the mootness doctrine necessarily apply to class actions. *Dallas Gay Alliance,* 719 F.Supp. at 1384. "A putative class representative who alleges no individual injury may not seek relief on behalf of himself or any other member of the class." *Id.* As explained in *Lusardi,* "when claims of the named plaintiffs become moot before class certification, dismissal of the action is required." *Lusardi,* 975 F.2d at 974. The Eleventh Circuit has stated:

> In a class action, the claim of the named plaintiff, who seeks to represent the class, must be live both at the time he brings the suit and when the district court determines whether to certify the putative class. If the plaintiff's claim is not live, the court lacks a justiciable controversy and must dismiss the claim as moot.

**\*3** *Tucker v. Phyfer,* 819 F.2d 1030, 1033 (11th Cir.1987).

Stated another way, a plaintiff cannot represent a class of which he is not a member. *Bailey v. Patterson,* 369 U.S. 31, 31-32 (1962). If the claim of the class action plaintiff is moot, the action must be dismissed under *Fed.R.Civ. P.* 12(b)(1).

In the instant case, there is no actual, ongoing controversy. It is undisputed that MCI issued a credit to Labora in the amount of $1 .52, which represents Labora's total potential damages in this case. *Daniels Aff.*, ¶ 3. This credit mooted Labora's own cause of action and renders him ineligible to represent the putative class. Because the only named plaintiff in this suit has no case or controversy, this case must be dismissed for lack of subject matter jurisdiction.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1998 WL 1572719
(Cite as: 1998 WL 1572719, *3 (S.D.Fla.))

Moreover, Labora's request for costs and interest does not create a case or controversy. As explained in *Bank of Marin v. England,* 385 U.S. 99, 111 n.1 (1966) (Fortas, J., dissenting), "[a]n unbroken line of cases establishes the rule that controversy as to costs alone does not salvage an otherwise moot case." Similarly, Labora's claim for attorney's fees also fails to save this case from dismissal. The Supreme Court has held that an "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480 (1990).

Accordingly, because MCI has credited Labora's account in the full amount of the charges at issue, Labora's claim is moot and the Complaint must be dismissed with prejudice. *See Simmer v. Rios,* 661 F.2d 655, 660 (7th Cir.1981); *Holstein,* 803 F.Supp. at 210.

CONCLUSION

For the foregoing reasons, it is hereby

ORDERED   AND   ADJUDGED   that Defendant's Motion to Dismiss, filed June 18, 1998, GRANTED. This case is DISMISSED. All pending motions are DENIED as moot, and this case is CLOSED.

1998   WL   1572719,   1998   WL   1572719 (S.D.Fla.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works